In the

# United States Court of Appeals
## For the Seventh Circuit

No. 18-2155

SHIRLEY LACKO,

*Plaintiff-Appellant,*

*v.*

UNITED OF OMAHA LIFE
INSURANCE COMPANY,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:17-cv-02100 — **Jorge L. Alonso**, *Judge.*

ARGUED NOVEMBER 5, 2018 — DECIDED JUNE 12, 2019

Before BAUER, ROVNER, and ST. EVE, *Circuit Judges.*

ROVNER, *Circuit Judge.* Shirley Lacko filed suit against
United of Omaha Life Insurance Company ("United"), chal-
lenging United's denial of her claims for short-term and long-
term disability insurance. Those claims were brought pursu-
ant to group insurance policies issued by United to her em-
ployer, BKD, Inc., an accounting firm. Specifically, BKD pro-

vided two group insurance policies, Group Short Term Disability Insurance Policy No. GUC-ABF3 (the "STD" plan) and the Group Long Term Disability Insurance Policy No. GLTD-ABF3 (the "LTD" plan). Both policies were issued by United, who also served as the claims review fiduciary for claims to STD and LTD benefits.

Lacko based her claims for STD and LTD benefits on the adverse combination of a number of impairments, including but not limited to gastroparesis, diabetes, rheumatoid arthritis, congestive heart failure, breathing difficulties, anxiety, musculoskeletal impairments, and cognitive difficulties related in part to the medication needed to manage the other conditions. The district court opinion details the extensive medical evidence presented to United in support of Lacko's disability benefits claims. It includes reports from numerous physicians, as well as objective evidence such as MRI, X-ray, and lab reports. An exhaustive recitation of that evidence, however, is unnecessary to resolve the issues presented in this case. Therefore, we will set forth the evidence only to the extent that it is necessary to decide the issues in this appeal and defer to the district court the more extensive recitation.

Although United initially approved her claims for STD benefits on three occasions for the time period spanning October 12, 2015 through November 22, 2015, it denied STD benefits on June 16, 2016 for the period beyond November 22, 2015, concluding the records failed to demonstrate a change in Lacko's medical condition at the time she stopped working or subsequently. United also denied her claim for LTD benefits. Lacko then filed this action in the district court under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 et seq., challenging the denial of LTD benefits,

and the denial of STD benefits from the period of November 22, 2015 until December 27, 2015 (at which time LTD benefits would apply). The district court granted summary judgment in favor of United, and Lacko now appeals that decision to this court.

**I.**

Lacko began working for the predecessor to BKD in approximately January 1999 and worked until September 25, 2015. She applied for benefits under the STD plan on October 2, 2015. At the time that she ceased working, her position at BKD was that of Senior Manager in the Audit Department, with an annual salary of $93,250.04.

The two disability plans covered different time periods. The first 90 days of disability are covered by the STD plan, which in relevant part provides benefits when ,"because of an Injury or Sickness, a significant change in Your mental or physical functional capacity has occurred in which: … You are prevented from performing the Material Duties of Your Regular Job (on a part-time or full-time basis) or are unable to work Full-Time … ." STD Plan at 27. The STD plan defines "Material Duties" as encompassing "the essential tasks, functions, and operations relating to Your Regular Job that cannot be reasonably omitted or modified," and "Regular Job" is defined as "the occupation You are routinely performing when Your Disability begins." *Id*. at 28–29.

The LTD plan applies beyond that 90-day period and includes slightly different requirements. Instead of speaking in terms of the claimant's ability to perform her regular *job*, the LTD plan provides benefits when the claimant is incapable of

the material duties of her regular *occupation*. Specifically, the LTD plan provides:

> **Disability** and **Disabled** means that because of an Injury or Sickness, a significant change in your mental or physical functional capacity has occurred in which You are:
>
>> (a) prevented from performing at least one of the Material Duties of Your Regular Occupation on a part-time or full-time basis; and
>>
>> (b) unable to generate Current Earnings which exceed 99% of Your Basic Monthly Earnings due to that same Injury or Sickness. …
>
> **Material Duties** means the essential tasks, functions, and operations relating to an occupation that cannot be reasonably omitted or modified. In no event will We consider working an average of more than 40 hours per week in itself to be part of material duties. One of the material duties of Your Regular Occupation is the ability to work for an employer on a full-time basis. …
>
> **Regular Occupation** means the occupation You are routinely performing when Your Disability begins. Your regular occupation is not limited to the specific position You held with the Policyholder, but will instead be considered to be a similar position or activity based on job descriptions included in the most current edition of the

> U.S. Department of Labor Dictionary of Occupational Titles (DOT). We have the right to substitute or replace the DOT with a service or other information that We determine of comparable purpose, with or without notice. To determine Your regular occupation, We will look at Your occupation as it is normally performed in the national economy, instead of how work tasks are performed for the specific employer, at a specific location, or in a specific area or region.

LTD Plan at 29–31.

Therefore, Lacko's entitlement to benefits under the LTD plan hinges upon whether Lacko was capable of fulfilling the material duties of her regular occupation. That focus on her occupation sets the stage for a major point of contention in this appeal, which is whether United used an appropriate occupational classification in determining her eligibility for benefits. As we will explore in detail later, United classified her position as that of a Department Manager under the Dictionary of Occupational Titles ("DOT"), but the Social Security Administration (SSA) used a different DOT title in assessing Lacko's claim for benefits, classifying her position as that of an Auditor or Accountant.

After Lacko's requests for STD and LTD benefits were denied, Lacko requested reconsideration of those determinations from United. With respect to the STD benefits claim, United in that appeal considered the evidence as to her gastroparesis, back pain, and osteoarthritis, and determined that she was capable of performing the duties of her job.

In appealing the denial of LTD benefits, Lacko provided United with the SSA decision granting benefits, but United again determined that the denial of LTD benefits was appropriate. In its determination denying that appeal regarding LTD benefits, United stated that it had considered her claim that she was disabled due to chronic pain, fatigue, congestive heart failure, hypertension, osteoarthritis, diabetes, asthma, gastroparesis, sleep disturbance, vertigo, vitamin D deficiency, anxiety and depression. United acknowledged that the file revealed a history of back pain and diffuse joint pain complaints, and that MRI studies of the lumbar, thoracic, and cervical spine documented multi-level degenerative changes with disc bulging in some areas. Additionally, it noted that X-rays confirmed arthropathy in Lacko's hands and feet. Accordingly, United determined that she would be restricted to sedentary work activities and should pursue continued treatment for pain management. It also found that her obstructive sleep apnea and the resulting fatigue could also support that limitation to sedentary work, and opined that her chronic obstructive pulmonary disease and asthma would not preclude sedentary work activities. Although it recognized other medical conditions, it did not find that they supported any further limitations. For instance, it recognized that she suffered from diabetes, but held that her diabetes was controlled with treatment and regular visits to her endocrinologist and therefore would not require any restrictions or limitations. It also acknowledged that she was diagnosed with chronic gastritis and with gastroparesis due to diabetes requiring treatment with medications. United found no limitations related to her vertigo or dizziness, or from cardiac conditions or hypertension. Finally, United recognized that symptoms of anxiety, depression and memory loss had been reported. It held that

there was no indication of an inability to perform the activities of daily living or of cognitive issues or memory impairment to preclude work activities. United noted that Lacko was evaluated by Dr. Steven Fritz, Psy.D., for a mental residual functional capacity assessment as a part of the Social Security review, and it stated that the evaluation found no evidence of memory impairment or cognitive impairment. United acknowledged that Lacko has multiple medical complaints requiring medication and regular visits to health providers, but tracking the language of the LTD plan, it held that it did not find evidence of a significant change in her physical or mental functional capacity on or around her last date worked to preclude her from continuing to perform the material duties of her regular occupation. It conceded that she had been found disabled by the SSA and was receiving disability benefits but held that the SSA decision did not affect its disability determination, stating only that "[e]ligibility requirements for Social Security Disability may differ from the eligibility requirements under this policy."

## II.

Lacko subsequently filed this ERISA action seeking STD benefits from November 22, 2015 through December 27, 2015, and LTD benefits thereafter, under § 502 of ERISA, 29 U.S.C. § 1132(a)(1)(B), which provides that "[a] civil action may be brought … by a participant or beneficiary … to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." The district court granted summary judgment to United.

First, the court considered the decision as to STD benefits. It held that United denied STD benefits on the basis that there

had been no change in Lacko's functional capacity that would prevent her from performing her job. The court found that it was reasonable for United to focus on whether Lacko had experienced a change in medical symptoms, because the plain language of the STD plan requires a change. According to the court, when Lacko was first granted STD benefits by United, it had received medical records from April 2015 that showed Lacko was "feeling good," and records from September 2015 showing that Lacko reported feeling pain all over, thus indicating a "change." Subsequently, United received additional medical records which showed that Lacko had suffered gastroparesis since at least 2011, and degenerative disc disease from at least 2013, and evidence that she had taken opiates for pain for a decade. The court held that "[g]iven that plaintiff's medical conditions were of long duration, it was reasonable for defendant to conclude that plaintiff had not experienced a *change* in functional capacity." Dist. Ct. Memorandum and Order of May 15, 2018 (hereinafter "Dist. Ct.") at 20.

The court then turned to United's denial of LTD benefits. First, it held that United did not err in relying on the DOT for her job description, because the LTD plan explicitly allows for such an approach. The court also rejected the argument that United erred in relying on the opinions of non-examining physicians. The court noted that Lacko supplied medical records from eight treating physicians, but six of them described only Lacko's symptoms and diagnoses without translating those into work restrictions. Of the two doctors that described work restrictions, the court described one—Dr. Daniel Hirsen—as providing useful but imprecise information in stating that Lacko was unable to sit for long periods of time due to neck and back pain and unable to do computer work due to joint swelling. The other doctor who identified work

restrictions, Dr. Vanessa Hagan, checked boxes indiscriminately, indicating that pain rendered her unable to perform every task on the list including basic tasks such as following rules and relating to co-workers. The court acknowledged that Dr. Hagan subsequently provided additional information about Lacko's restrictions, stating that Lacko's pain medication makes it difficult for her to focus such that she could not work if she took her medications as prescribed. The court countered, however, that "[s]eparately and to the contrary, the Social Security Administration concluded that plaintiff was capable of performing light-duty work." *Id*. at 23. Based on the competing conclusions and the imprecise restrictions, the court concluded that it was reasonable for United to seek review of the records by non-examining physicians and adopt their conclusions that she was restricted to sedentary work.

The court next considered whether United properly considered her various ailments in combination when determining her restrictions. The court noted that the treating physicians had determined that her physical ailments limited her to sedentary work. The court noted, however, that the sedentary restriction related only to her physical capability, and that Dr. Hagan had noted, in describing the combined effect of Lacko's ailments, that the medications for those conditions affected Lacko's ability to focus. The court rejected Lacko's argument that United failed to take that mental impairment into account. The court noted that in its decision, United specifically recognized that Lacko had seen Dr. Fritz for a mental residual capacity evaluation in connection with her application for Social Security benefits. The court stated that "[t]he

result of that evaluation was that plaintiff had sufficient concentration and attention to work." Dist Ct. at 24. The court held that United's analysis was therefore reasonable.

Finally, the court considered Lacko's argument that the denial of benefits was arbitrary and capricious because United failed to properly consider the SSA decision granting her benefits. The court held that United reviewed that decision and noted that the standard for disability benefits from SSA is not the same as the terms of the Plan. In addition, the court noted that the SSA decision concluded that Lacko could perform light work, but granted benefits because her age, education and lack of transferable skills made an award mandatory. The Plan in this case does not require benefits based on age and skill. In conclusion, the court stated that United did not ignore the SSA decision; rather, United "reviewed the evidence, was persuaded by some of it (including Dr. Fritz's assessment) and rejected some of it (including the conclusion that plaintiff could do light duty work; defendant concluded plaintiff was more restricted)." Dist. Ct. at 25. The district court therefore granted summary judgment to United.

## III.

On appeal, Lacko raises a number of challenges to United's denial of her LTD and STD benefits. First, she alleges that United erred in concluding that there was no change in her physical functional capacity which would prevent her from performing the material duties of her job, and that it further erred in using an incorrect occupational description. She also argues that United's decision is deficient in that it failed to adequately address the grant of Social Security disability benefits. Moreover, Lacko asserts that United, in denying benefits, failed to address the combination of impairments, and

improperly relied on the opinions of non-examining physicians who ignored objective medical evidence.

We review *de novo* a district court's grant of summary judgment. *Hennen v. Metro. Life Ins. Co.*, 904 F.3d 532, 539 (7th Cir. 2018); *Holmstrom v. Metropolitan Life Ins. Co.*, 615 F.3d 758, 766 (7th Cir. 2010). But where, as here, a plan grants to the administrator the discretionary authority to determine benefits, we review the decision of that administrator under the more stringent arbitrary and capricious standard. *Id*. Although that standard is necessarily deferential, it is "'not a rubber stamp'" and we will not uphold an administrator's decision "'when there is an absence of reasoning in the record to support it.'" *Id*.

## A.

"In conducting this review, we remain cognizant of the conflict of interest that exists when the administrator has both the discretionary authority to determine eligibility for benefits and the obligation to pay benefits when due." *Jenkins v. Price Waterhouse Long Term Disability Plan*, 564 F.3d 856, 861 (7th Cir. 2009); *Metro. Life Ins. v. Glenn*, 554 U.S. 105, 112, 114 (2008); *Hennen*, 904 F.3d at 539; *Dragus v. Reliance Standard Life Ins. Co.*, 882 F.3d 667, 673 (7th Cir. 2018). Both parties acknowledge that United stands in that position, as the determiner of eligibility for benefits and the payor of benefits.

The Supreme Court and this court have clearly and consistently held that a conflict of interest is present where the administrator has both the authority to determine benefits and the obligation to pay them, and that such a conflict is weighed as a factor in determining whether there is an abuse

of discretion, and can act as a tiebreaker when the other factors are closely balanced. *Glenn*, 554 U.S. at 117; *Hennen*, 904 F.3d at 539; *Dragus*, 882 F.3d at 673. Surrounding circumstances may increase or decrease the likelihood that the conflict of interest impacted the disability determination. For instance, a conflict of interest "should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decision-making irrespective of whom the inaccuracy benefits." *Glenn*, 554 U.S. at 117. Similarly, the potential adverse impact of a conflict of interest can be ameliorated where an administrator uses separate third-party vendors to secure independent physicians who then review the claim. See *Dragus*, 882 F.3d at 673. United argues that it employed such procedures here, which can create a distance between the conflict and the decision thus decreasing the likelihood that the disability determination was impacted by the conflict.[1]

In contrast, "a conflict may carry more weight when the 'circumstances suggest a higher likelihood that it affected the benefits decision,' as when an insurer has a history of biased claims administration," takes inconsistent positions in the Social Security disability proceedings and its own disability determination, constantly changes its demands to avoid award-

---

[1] As we will discuss later, however, in this case the use of independent examiners does not insulate United from the decision because those examiners did not consider the cognitive limitations and would still be limited by the evidence and job descriptions provided by United.

ing benefits, or engages in selective consideration of the evidence. *Raybourne v. Cigna Life Ins. Co. of New York*, 700 F.3d 1076, 1082 (7th Cir. 2012) quoting *Glenn*, 554 U.S. at 117; *Holmstrom*, 615 F.3d at 772, 777–78. For instance, where the administrator assists the claimant in obtaining Social Security disability benefits, arguing that she is unable to engage in any work, and then after obtaining those benefits, denies disability benefits under its own plan, the self-dealing can signal that the administrator is acting in its own interests rather than that of the claimant. The Plan benefits in such a situation because it is often entitled to recover some of the Social Security benefit awarded to the claimant, and it avoids the payment of money to the claimant in denying benefits under its own plan. We have recognized that "this scenario justified the reviewing court in giving more weight to the conflict because the seemingly inconsistent positions taken by the insurer were both financially advantageous to the insurer." *Raybourne*, 700 F.3d at 1088; *Glenn*, 554 U.S. at 118; *Holmstrom*, 615 F.3d at 777. Such concordance between the actions and positions taken by the administrator and its own financial interest suggest a higher likelihood that the conflict of interest affected the benefits decision. See *Raybourne*, 700 F.3d at 1088. That is the scenario present in many cases in which we have held that the conflict of interest could have impacted the disability determination, but there is no evidence that United engaged in self-dealing of that nature here. United argues that *Raybourne* is inapplicable because that involvement in the social security process was absent here, but that self-dealing is merely one factor impacting the weight given to that structural conflict of interest, and does not mean that no structural conflict exists. Courts must consider all surrounding circumstances in determining

whether that conflict of interest could have impacted the disability determination.

Another circumstance that should alert the court that the conflict of interest may have influenced the decision is found where the administrator engages in only a selective presentation of the evidence in the record, focusing on the portions that will support a denial of the claim and ignoring or misrepresenting the facts that could demonstrate the disability. See *Holmstrom*, 615 F.3d at 777; *Raybourne*, 700 F.3d at 1082; *Glenn*, 554 U.S. at 118. As we will discuss, this case does present such a selective presentation of some of the evidence in the record. In fact, the failure to consider some of the evidence requires a remand here even absent a consideration of the conflict of interest, because it renders the decision arbitrary. *Holmstrom*, 615 F.3d at 776–77 (in addition to showing that the conflict of interest may have influenced the decision, selective consideration of the evidence can indicate that a decision was arbitrary even aside from that conflict). Although the conflict of interest is therefore a factor, which is weighed more heavily in light of that selective presentation of the evidence, that conflict does not act as a tiebreaker here because a remand is required even absent that conflict.

**B.**

We turn first to the claim that United failed to adequately address the Social Security disability determination, because that issue touches upon at least two other arguments presented by Lacko—namely, her argument as to the proper occupational description and her argument that United failed to address the combination of impairments. SSA determined that Lacko was entitled to benefits. That determination in-

volved the application of SSA's five-step sequential evalua-
tion process. See 20 C.F.R. § 404.1520. Under the first three
parts of the test, SSA determined that Lacko was not engaged
in substantial gainful activity, that she had severe medically-
determinable impairments consisting of inflammatory arthri-
tis, disorders of back—discogenic and degenerative, chronic
heart failure, and affective disorders, and that her impair-
ments did not meet or equal a listing. See *id*. Before proceed-
ing to the fourth step, the regulations require SSA to assess
the claimant's residual functional capacity, which it then uses
at steps four and five when evaluating the claim at those
steps. 20 C.F.R. § 404.1520(a)(4). SSA conducted a physical re-
sidual functional capacity assessment and a mental residual
functional capacity assessment ("MRFC"). The MRFC was
conducted by Dr. Fritz and determined that Lacko had under-
standing and memory limitations. Although he found that
Lacko was not significantly limited in her ability to remember
locations and work-like procedures and her ability to under-
stand and remember very short and simple instructions, Dr.
Fritz concluded that she was moderately limited in her ability
to understand and remember detailed instructions. He fur-
ther concluded that she sustained concentration and persis-
tence limitations which rendered her moderately limited in
her ability to carry out detailed instructions. Finally, he also
determined that she had adaptation limitations, in that she
was moderately limited in her ability to respond appropri-
ately to changes in the work setting.

SSA applied that MRFC in considering at step four
whether she was capable of performing her past relevant
work. First, it identified the DOT title for her past relevant
work, determining that the job titles of Field Auditor and Ac-
countant were proper. SSA determined that Lacko could not

perform her past relevant work because her MRFC reduced her skill level. It determined that her past relevant work was skilled work, and that her impairments limited her to unskilled, light work.

United and the district court both recognized that SSA had limited her to light work, a higher level than the sedentary work limitation that United found, but neither addressed her mental limitations. Neither United nor the district court acknowledged or addressed the determination that she was limited to unskilled work based on the MRFC. In fact, the decisions by United and the district court mischaracterized the SSA decision. United characterized Dr. Fritz's evaluation as finding no evidence of memory impairment or cognitive impairment, but that is unsupportable. The SSA decision, and specifically the MRFC within it, found her moderately limited in her ability to understand and remember detailed instructions, carry out detailed instructions, and respond appropriately to changes in the work setting, and based on that MRFC she was deemed limited to unskilled work and therefore unable to perform her past work which was skilled work. United never acknowledged those memory and cognitive limitations found by Dr. Fritz, nor the limitation to unskilled work that followed from that MRFC.

Similarly, United again acknowledges only part of Dr. Fritz's findings on appeal, characterizing them as follows:

> A mental status assessment conducted on June 24, 2016 by Dr. Steven Fritz, Psy. D. found Ms. Lacko to have (1) sufficient attention and concentration to persist at and complete work activities for the usual periods required in the general work force; (2) the capacity for adequate

> pace and perseverance to maintain a schedule and on time attendance and (3) the capacity to complete a normal work day and work week on a regular basis. Dr. Fritz also determined that psychologically based symptoms would not markedly impair Ms. Lacko's capacity to complete a normal work week.

(citations omitted) Appellee's Brief at 22. That summary recites the conclusions of Dr. Fritz as to her ability to fulfill the duties of unskilled work, but again fails to reflect the areas in which he found her moderately limited, and which precluded her from skilled work.

And other than that mischaracterization of the mental limitations, United in its denial of LTD benefits did not further attempt to reconcile the SSA determination that she was entitled to disability benefits, dismissing it with one statement: "Eligibility requirements for Social Security Disability may differ from the eligibility requirements under this policy." See Dist. Ct. at 16. That trite statement is of no value in any analysis. That something "may differ" from the Plan requirements says nothing, as it is noncommittal as to whether there is any actual difference. It failed to identify any difference, and to explain how that difference would impact the disability determination.

On appeal, United argues that the SSA decision granting benefits was based in part on her age, and that age is not a factor under the Plan. The final decision by the SSA, at step five of the sequential evaluation process, considers whether the claimant is capable of making the adjustment to other work, and the claimant receives disability benefits only if the SSA concludes that she is both not capable of performing her

past relevant work and not capable of adjusting to other work. At step five, the SSA considers factors such as age and education, which are not factors in United's determination of disability. That difference is irrelevant, however, because those factors are not considered by the SSA at step four in determining her ability to perform her past work, and that is the analysis that equates with the Plan's language. The question at step four of the SSA evaluation process was whether Lacko was capable of performing her past work as it is performed in the national economy, and the Plan under which United denied benefits similarly considers whether she was prevented from performing the material duties of her regular occupation. There is no apparent basis for determining that the SSA determination of her ability to perform past work is materially different from the disability eligibility requirements for United. That discussion by United is insufficient to constitute a reasoned consideration of Dr. Fritz's evaluation or the SSA decision as a whole.

Moreover, the record lacks any mental or psychological evaluation that contradicts or casts doubt on the conclusions by Dr. Fritz, and United has never challenged or questioned those findings. Those findings indicate that Lacko is incapable of performing an occupation that requires more than unskilled work. Unskilled work for SSA purposes is work that "requires little or no judgment to do simple duties that can be learned on the job in a short period of time (30 days or less)." Program Operations Manual System (POMS) DI 25015.017. Skilled work, in contrast, "[r]equires high levels of judgment and adaptability; [i]nvolves setting realistic goals or making plans independently; [r]equires understanding, carrying out, remembering complex instructions; [e]ncompasses abstract

ideas and problem solving; … and requires both … work activity exercising judgment beyond carrying out simple duties … and knowledge of principles and processes of an art, science, or applied trade and the ability to apply that knowledge in a proper and approved manner." *Id*. There is no basis whatsoever in the record to conclude that a job of Senior Manager for the Audit Department is anything less than skilled work. Therefore, because United failed to recognize and address the cognitive limitations set forth in the SSA decision, there is no reasoned basis in the decision to support the determination that Lacko was ineligible for disability benefits.

The district court failed to address that deficiency in United's analysis. In addressing the MRFC, the court stated that "[t]he result of that evaluation was that plaintiff had sufficient concentration and attention to work," and held that United's analysis was therefore reasonable. Dist. Ct. at 24. On appeal, United continues in its selective characterization of the SSA's decision, stating that "[t]he SSA also found that Ms. Lacko's limitations as a result of her pain, weakness, fatigue and alleged understanding and memory difficulties had not arisen to such level as to prevent her from participating in work related activities." Appellee's Brief at 23. That of course is only partially true. The MRFC evaluation indeed determined that Lacko possessed sufficient concentration and attention to "work" if the work was unskilled work. Her limitations were not so severe as to preclude unskilled work. But it determined that she lacked the ability to perform her past relevant work because it was skilled work. The district court, like United, failed to recognize and address that significant distinction, which is controlling for the purposes here of determining her ability to perform the job of Senior Manager. Moreover, the district court held that United accepted the

findings of Dr. Fritz. If, as the district court states, United accepted the determination of Dr. Fritz, then it would have to accept that Lacko possessed mental limitations that rendered her incapable of work other than unskilled work.

## C.

In considering the SSA decision, United also failed to address the different classification used by the SSA from the *Dictionary of Occupational Titles* (4th ed. 1991) ("DOT"). The LTD plan required United to determine whether Lacko could perform her regular occupation, which it defined as not limited to her specific position, but "instead will be considered to be a similar position or activity based on job descriptions included in the [DOT]." In denying benefits, United characterized her job as one of "189.167-022 Manager, Department," a generic classification under the DOT that falls under the general catchall category of "189 Miscellaneous Managers and Officials, NEC." According to the DOT, "[t]his group includes miscellaneous managers and officials, not elsewhere classified." DOT defines this position as applying to one who "[d]irects and coordinates, through subordinate supervisors, department activities in commercial, industrial, or service establishment," and the only reference to financial work is that it can include one who "[m]onitors and analyzes costs and prepares budget, using computer." *Dictionary of Occupational Titles 189 (4th ed. 1991)*

In contrast, the SSA classified Lacko's job as falling under "160 Accountants, Auditors, and Related Occupations," which falls under category 16 that "includes occupations concerned with specialized administrative and managerial functions which are common to many types of organizations," and

specifically "160.167-038 Auditor, Tax" and "160.162-018 Accountant." The DOT provides that:

> This group includes occupations concerned with examining, analyzing, and interpreting accounting records for the purpose of giving advice or preparing statements. It also includes occupations involved in devising or installing accounting systems and advising on cost-recording systems or other financial and budgetary data.

*Dictionary of Occupational Titles 160 (4th ed. 1991).* The titles used by SSA therefore apply to the audit and accounting managerial functions common to many organizations. Those appear more directly related to the Senior Manager position at issue here.

They also more closely align with the job description for the position of Senior Manager in the Audit Department. The summary of the job description by BKD, upon which the parties agree, provides that:

> The Senior Manager supervises Seniors, Associates, and Interns. He or she is responsible for audit program approval, personnel scheduling, audit working papers review, financial statement disclosure footnote approval, day to day client relationships, determination of billings for engagements, and evaluation of Interns, Associates, and Seniors.

Defendant's Response to Plaintiff's Local Rule 56.1 Statement of Material Facts 12 at 5–7. That description indicates that the position requires the specialized skills of an auditor rather

than solely managerial skills. In addition, the job description includes the following list of "Essential Duties and Responsibilities," which more precisely delineate the job requirements:

- Manages multiple concurrent engagements without disruption or loss of control and within the time allotted

- *Correctly completes and reviews routine audit engagement procedures in a timely and professional manner*

- Demonstrates ability to recognize problems and proposes sensible solutions, with appropriate balance between clients' needs and firm's risk

- Establishes accountability for meeting assigned deadlines or budgets and provides advanced warning of variances

- *Demonstrates proficiency/subject matter expertise with industry-specific technical standards, participation in specialty professional organizations and anticipates impact of specialty with clients and BKD teams*

- *Conducts and reviews technical research and applies research to findings within complex accounting areas*

- Proven ability to supervise and train other professionals

- Balances assigned workload between self and staff. Provides staff with timely performance feedback

- Develops contacts and referral sources through involvement in professional or civic community organizations as a committee member or board member

- Business Development: sells services to new and existing clients that provide value to clients, building client loyalty and satisfaction.

(emphasis added) *Id*. As the italicized sections demonstrate, the essential duties and responsibilities of Lacko's position required technical and specialized expertise and included duties beyond the common supervisory duties of a manager, such as the duty to conduct technical research and apply research to findings within complex accounting areas.

United's vocational expert nevertheless determined that only the general, catchall "Manager, Department" title of the DOT was the most applicable. Tellingly, that vocational expert's listing of the material duties of Lacko's position included only the general summary of the job description set forth above, along with an exposition of such standard managerial responsibilities as that of interviewing, hiring and training employees and appraising performance. Absent from the Senior Manager job description set forth by United's vocational consultant is any mention of the "Essential Duties and Responsibilities," including the more specialized and technical duties italicized above.

In fact, nothing in the vocational expert's description mirrors or even alludes to the technical and specialized duties italicized above, which constitute 3 of the 10 essential job duties. Moreover, the essential nature of those duties is reinforced by the education and experience requirements of the

job, which mandated that the Senior Manager have seven years of public accounting experience or its equivalent, that she have certification as a Certified Public Accountant (CPA), and that she maintain a current CPA license. The vocational expert's report fails to mention those job requirements, and therefore could not properly determine whether the DOT occupation of "Manager, Department" was a "similar position or activity" to her specific position, as required under the LTD plan. Finally, although United's vocational consultant discussed the physical demand characteristics of the occupation, identifying it as at the sedentary exertion level, the consultant never examined the mental characteristics of the occupation, which would have identified the skill level needed for the position.

We have repeatedly condemned that type of selective consideration of only the evidence that supports one outcome. See *Holmstrom*, 615 F.3d at 777; *Raybourne*, 700 F.3d at 1082; *Glenn*, 554 U.S. at 118. The determination that Lacko's job fell within the DOT title "Manager, Department" is rendered questionable because the vocational expert's job description failed to include those essential duties that required her specialized audit and accounting skills, and failed to identify the educational and license requirements of the position. In light of that deficiency, the failure to acknowledge and reconcile the alternative DOT title applied by SSA is even more egregious. That, in turn, impacted the disability determination because United never engaged in a determination as to whether Lacko had the mental and physical capacity to perform the tasks required of an Auditor or Accountant position under the DOT.

At a minimum, United should have addressed the DOT classification used by the SSA. Moreover, United should have reconciled its choice of the more general DOT title in relation to all of the job requirements, including the requirement that Lacko maintain a current CPA license.

## IV.

Therefore, both in its assessment of Dr. Fritz's evaluation, and its consideration of the DOT classification, United provided a selective characterization of the record that discussed only the portions that would favor a determination that Lacko was not disabled, and ignored or mischaracterized the portions that would support a finding of disability. We have previously held that where an administrator is operating under a conflict of interest, as United is here, such a selective analysis is evidence that the conflict of interest may have impacted the decision. See *Holmstrom*, 615 F.3d at 777; *Raybourne*, 700 F.3d at 1082; see also *Glenn*, 554 U.S. at 118. The potential impact of that conflict of interest is a factor to consider in determining whether the decision was arbitrary. We note that the use of third-party reviewers, as United did here, can provide some separation between the decision and that conflict of interest, lessening the likelihood that the conflict impacted the decision, but here that is of little value because those reviewers were not asked to opine as to the mental limitations nor is there any indication that they received the proper description of the job requirements. In the end, however, our decision that a remand is necessary does not depend on that conflict of interest as the tipping point, because even absent a conflict of interest the decision cannot be sustained based on the failure to properly characterize and address Dr. Fritz's evaluation and the mental limitations, and the failure to address the DOT

classification used by the SSA. See *Holmstrom*, 615 F.3d at 773 (a plan administrator must address the Social Security findings and evidence in the record and provide a reasonable explanation for discounting it).

That determination is dispositive as well of Lacko's claim that United failed to address the combination of her impairments.[2] United failed to discuss the mental limitations found by Dr. Fritz, and the impact of Lacko's medications on her cognitive and physical functioning. Accordingly, United must address the combination of all her impairments, including the impact of medication and treatment for those ailments, on her ability to perform the material duties of her regular occupation. That failure to consider the combination of impairments, including the mental limitations, on her ability to perform her job is fatal to the denial of STD benefits as well. Moreover, we would note that the Plan's requirement of a "change" in a person's physical or mental capacity in order to qualify for benefits does not by its terms preclude a degenerative condition from qualifying a claimant for benefits. A condition can exist for years, and only prevent a person from performing her job at a later point in time when the worsening condition proves

---

[2] Lacko also asserts that United erred in crediting the opinions of non-examining physicians over the opinions of her treating physicians, particularly where the Plan allowed United to require Lacko to submit to an examination from a physician of United's choice. It is well-established, however, that unlike disability claims under SSA, a plan administrator determining disability benefits is not required under ERISA to give special deference to the opinions of treating physicians. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003).

unmanageable. The deterioration can be sufficient to constitute a change in conditions under the plain language.

The most common remedy when an ERISA plan administrator's benefits decision is deemed arbitrary is to remand the matter for a fresh administrative decision, rather than to grant an outright award of benefits, and we believe that is the appropriate remedy here. *Holmstrom*, 615 F.3d at 778; *Hennen*, 904 F.3d at 542. A remand is necessary for United to reassess Lacko's claim in light of the deficiencies identified in this opinion.

Accordingly, the decision of the district court is REVERSED and the case REMANDED for further proceedings consistent with this opinion.